[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 24-11372

_____

ANTHONY LESLIE,
TANYEKA LESLIE,

           Plaintiffs-Appellants,

*versus*

DAIMLER TRUCKS NORTH AMERICA LLC,
f.k.a. Freightliner LLC,

           Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:18-cv-03831-WMR

———————————

Before BRANCH, ABUDU, and KIDD, Circuit Judges.

PER CURIAM:

Around 7:30 on the morning of January 31, 2017, Plaintiff Anthony Leslie was driving a 2005 Columbia heavy truck eastbound at "approximately 70 miles per hour" on I-16 near Statesboro, Georgia when he crashed into stopped traffic. The crash breached the truck's fuel tank and started a fire that left Leslie with burns over 90% of his body. Leslie sued the manufacturer of the 2005 Columbia, Daimler Truck North America ("Daimler"), for failure to warn and negligent design of the fuel tank. The district court granted summary judgment to Daimler on both of Leslie's claims. Leslie argues that the district court erred by doing so.

We disagree with Leslie on both counts and affirm the district court's judgment. Under Georgia law, Daimler had no duty to warn Leslie of the open and obvious risk that crashing his truck at freeway speeds could result in a fire. Likewise, failure to adopt theoretical safety mechanisms not tested or adopted by any other heavy truck in the United States cannot show a reckless disregard to Leslie's life under Georgia law. Accordingly, we affirm the district court.

## I.    Background

### A. The Accident

In 2008, Leslie went to school for, and passed his test to obtain, a "Commercial Driver's License" ("CDL").  For the next 8 years, he drove heavy trucks for various companies.  Then, in summer of 2016, he was hired by Atlantic Trucking.  His primary duties at Atlantic involved driving from McDonough to Savannah and back.  Because he did not own his own truck, Leslie would use different trucks provided to him by contractors with Atlantic on his trips.

One of those trucks was a 2005 Freightliner Columbia, which was manufactured and produced by Daimler.  The 2005 Columbia is a Class VIII heavy truck with a gross vehicle weight rating of over 33,001 pounds.  Unsurprisingly, given the commonality of and danger associated with such trucks, their design is tightly regulated.  These regulations include, as relevant here, extensive regulations relating to the placement and safety of fuel tanks.  *See, e.g.*, 49 C.F.R. § 393.67(d)–(e).

Federal Motor Carrier Safety Regulations ("FMCSRs") authorize the location of fuel tanks outside a truck's frame rail and require that side-mounted fuel tanks meet a series of specific requirements, including passing a safety venting system test, a leakage test, a 30-foot drop test, and a fill pipe test.  *See id.*  Relevant to this case, the 2005 Columbia has two diesel fuel tanks, one mounted on each side of the truck outside the frame rail.  It is

4                    Opinion of the Court                24-11372

undisputed by either party that these fuel tanks met all applicable federal safety standards.

The 2005 Columbia's fuel tanks were also designed in light of previous crashes and a 1989 National Highway Traffic Safety Administration ("NHTSA") study performed alongside the University of Maryland and today known as the "Maryland Study."[1]  The Maryland Study recognized the fire risks from the placement of the fuel tanks outside the frame rail, particularly given the risk of breach by one of the front axles that could occur during a frontal collision.  Nevertheless, the study also determined that "[a] less vulnerable position is not apparent[.]"  The study further explained that "[i]mplementation of any mitigation strategy requires careful consideration to assure that potential changes do not create new breach mechanisms.  This is particularly true for fuel tanks." For example, the study considered that "[f]uel tanks could be placed more centrally behind the cab, but this might result in new breach mechanisms during jackknife accidents."  And notably, Leslie's expert agrees that no manufacturer of heavy trucks in the United States, either at the time of the 2005 Columbia's construction or today, place diesel fuel tanks anywhere other than outside a truck's frame rails.

This background on the 2005 Columbia brings us to the accident that gives rise to this case.  Around 7:30 on the morning of January 31, 2017, Leslie was driving in a 2005 Columbia

---

[1] Leslie's expert, Dr. Brian Herbst, described this study as the most comprehensive study on fire risks in heavy trucks "that I've seen."

eastbound at "approximately 70 miles per hour" on I-16 near Statesboro, Georgia. Leslie had driven the route many times before; it was part of his "normal daily route" between McDonough and Savannah. The weather was calm, the road was straight, and the day was clear. Leslie was traveling at around 71 miles an hour and had the cruise control on. He was speaking with his wife on the phone. And though the sun was rising, he had not yet put down his sun visor because "[i]t was getting light, but the sun wasn't shining yet."

Unfortunately, despite the clear conditions, something caused Leslie not to notice severely slowed traffic in front of him. According to Leslie, the only warning he had that something was wrong ahead was when he noticed "the glare from the sun," likely caused by the sun reflecting off the metallic exterior of other tractor-trailers. He braked and put down his sun visor. "A couple of seconds later," he noticed stopped trailers in front of him and tried to swerve left.

Leslie hit the truck in front of him with enormous force. Based on GPS data and Leslie's testimony that the cruise control was set to 71 miles per hour, Daimler's experts estimated that the crash occurred at between 65 and 71 miles per hour.[2] Given the weight of Leslie's truck, his truck was moving with between 4.7 million and 5.6 million foot-pounds of energy, roughly 33 to 39

_____

[2] None of Leslie's experts attempted to directly calculate the speed at the time of the collision, though Leslie's expert did conclude Leslie maintained a speed of between 41–46 miles per hour even after colliding with the stopped tractor.

times the force used by NHTSA to test the ability of a family sedan to sustain a full-on frontal collision. Even though Leslie managed to swerve enough to avoid a head-on impact, the crash remained sufficiently forceful to push the truck he collided with over 53 feet and into another truck. That second truck was pushed 148 feet forward and off the road.

Given the forces involved, the damage, unsurprisingly, was enormous. The crash significantly deformed the heavy steel trailer Leslie hit; the rear axle was jammed forward, causing the left rear outer tire to detach and "heavily deforming the left rear outer wheel." As for Leslie's vehicle, the massive collision severely impacted the right side of the engine and the passenger side of the cab. What survived of the truck's engine was forced backwards, marring the frame and other components.

The collision also breached the fuel tank in Leslie's truck, causing a subsequent fire. The impact to the front of Leslie's truck caused two bolts that couple the front axle to the truck's frame to break, allowing the front axle to be forced rearward by the crash. This force, in turn, pushed the right front wheel/tire assembly into the right fuel tank. "The material first ignited was diesel fuel vapor that became available when the right fuel tank was breached." "The propagation of the fire was initiated with a 'fireball event,' which was due to the ignition of a significant quantity of diesel vapor that was emitting . . . from the breach of the right fuel tank."

Fortunately, Leslie survived, likely because of his understandably quick actions to evacuate himself from the fire that

ensued.  Unfortunately, "by the time the vehicle came to rest, [Leslie] had sustained severe burns which resulted in him sustaining burn injuries over 90% of his body."  To date, he has medical expenses "approaching $15 million."

B.  *Procedural History*

Leslie[3] filed suit against Daimler on August 10, 2018.  In his Complaint, Leslie asserted negligent design claims (Count 1) and negligent failure to warn claims (Count 2).  After years of discovery, Daimler moved for summary judgment on all of Leslie's claims.

The district court granted Daimler's motion for summary judgment.  First, the district court rejected Leslie's failure to warn claim because the claim failed as a matter of law on three separate, necessary elements under Georgia law: duty, breach, and causation.  Second, regarding Leslie's negligent design claims, the district court found that because the truck involved in the accident had been sold in 2005 and the accident occurred in 2017, the 10-year Georgia statute of repose applied,[4] meaning liability could be

---

[3] Leslie's spouse also filed claims for loss of consortium, which are contingent on the validity of Leslie's claim.  Given we affirm the district court's summary disposal of all of Leslie's claims, we likewise affirm the disposal of her contingent claims.

[4] A statute of repose serves to bar liability for any legal claim arising after the date of "repose."  *See* O.C.G.A. § 51-1-11(b)(2).  In other words, under Georgia law, subject to certain exceptions such as when an injury "aris[es] out of conduct which manifests a willful, reckless, or wanton disregard for life or

had only if the manufacturer engaged in willful, wanton, or reckless disregard for life.  The district court found that "there is simply no evidence that Daimler's conduct" met that standard and that "Plaintiffs cannot create a genuine issue of material fact . . . with [] after-the-fact expert opinion[s] . . . espousing alternative designs or concepts that have not been shown to be compliant with . . . [r]egulations or accepted by any commercial manufacturer[.]"

Leslie filed a timely notice of appeal from the district court's grant of summary judgment.

## II.    Standard of Review

We review "[the] district court's grant of summary judgment de novo, viewing all evidence and drawing all reasonable factual inferences" for the non-moving party. *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012).  To survive summary judgment, a plaintiff must produce sufficient evidence from which a reasonable trier of fact could rule in its favor. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986).

## III.    Discussion

On appeal, Leslie argues that the district court erred by granting summary judgment to Daimler on both his negligent design and failure-to-warn claims. According to Leslie, a jury could properly find that Daimler owed a duty to, and failed to, warn him

---

property," a claim for negligent design of a product is barred if the product was sold more than ten years before the incident at issue occurred. *See id.*; *see also* O.C.G.A. § 51-1-11(c).

that the design of its 2005 Columbia truck created a heightened risk of a fuel-fed fire in foreseeable and common frontal collisions. Leslie also argues that a jury could properly find that Daimler's design of its 2005 Columbia truck constituted a reckless disregard for life because Daimler made no changes to its design despite evidence of past crashes and theoretical alternatives that may have increased safety. We disagree on both counts and affirm the district court's judgment.

> A. *Daimler owed Leslie no duty-to-warn of the risk of fire resulting from a high-speed frontal collision*

Leslie argues that the district court erred by finding Daimler owed him no duty because the risk of a fire from a high-speed truck crash was open and obvious. According to Leslie, the risk for which Daimler owed him a duty to warn was the "heightened risk" that a 2005 Columbia's fuel tank placement would cause it to catch fire in a frontal collision. Further, because Leslie knew nothing about the specifics of that design or any allegedly inadequate measures taken to prevent fires, he argues the risk of a fire from a frontal collision was neither open nor obvious. We disagree and hold Daimler owed Leslie no duty because the risks of his conduct were open and obvious.

Because the accident occurred in Georgia and does not involve any questions of federal law, we look to Georgia law to determine whether summary judgment of Leslie's claims was

appropriate.[5] *See Flintkote Co. v. Dravo Corp.*, 678 F.2d 942, 945 (11th Cir. 1982) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938)).

Turning then to Leslie's claims, "under Georgia law, a manufacturer has a duty to warn of nonobvious foreseeable dangers from the normal use of its product." *Thornton v. E.I. Du Pont De Nemours & Co.*, 22 F.3d 284, 289 (11th Cir. 1994). Normally, "[w]hether a duty to warn exists . . . . [is] generally [] not susceptible to summary adjudication and should [ordinarily] be resolved by a trial . . . ." *Hunter v. Werner Co.*, 574 S.E.2d 426, 431 (Ga. Ct. App. 2002) (quotations omitted). That said, when the "danger is open and obvious, the manufacturer is entitled to

---

[5] As a federal court, we possess limited jurisdiction: our jurisdiction is proper only where the Constitution permits it and where Congress has authorized it. Here, our jurisdiction comes from the "diversity" of the parties, which means that the parties are not residents of the same state. *See* U.S. Const. art. III, § 2; 28 U.S.C. § 1332. Accordingly, because there is no federal law at issue, the substantive law of the forum state applies to the plaintiff's claims. *See Flintkote*, 678 F.2d at 945. Leslie's accident occurred in Georgia, meaning the "state law" that applies is Georgia law. *Id.*

In order to determine what Georgia law says, "federal courts [] follow the decisions of the state's highest court, and in the absence of such decisions on an issue, must adhere to the decisions of the state's intermediate appellate courts unless there is some persuasive indication that the state's highest court would decide the issue otherwise." *Id.* Further, "when we have issued a precedential decision interpreting that state law, our prior precedent rule requires that we follow that decision, absent a later decision by the state appellate court casting doubt on our interpretation of that law." *EmbroidMe.com, Inc. v. Travelers Prop. Cas. Co. of Am.*, 845 F.3d 1099, 1105 (11th Cir. 2017).

24-11372              Opinion of the Court              11

judgment as a matter of law." *Lamb ex rel. Shepard v. Sears, Roebuck & Co.*, 1 F.3d 1184, 1190 (11th Cir. 1993).

In order to succeed on a failure to warn claim under Georgia law, a plaintiff must show first that "the defendant had a duty to warn," second "that the defendant breached that duty," and third "that the breach proximately caused the plaintiff's injury." *Dietz v. Smithkline Beecham Corp.*, 598 F.3d 812, 815 (11th Cir. 2010). Each element is essential to maintaining a claim. Thus, if Leslie cannot show Daimler owed him a duty, his claim must fail. *Id.*

The first (and ultimately dispositive) question for determining whether Daimler owed Leslie a duty to warn is whether the danger that befell Leslie was "open and obvious." We have held that under Georgia law, "[t]he existence of an open and obvious danger constitutes an absolute legal defense to the claims of . . . failure to warn cases under Georgia law." *Lamb*, 1 F.3d at 1190. In other words, "[t]here is no duty to warn of the obvious." *McLemore v. Genuine Parts Co.*, 722 S.E.2d 366, 369 (Ga. Ct. App. 2012).

Evaluating whether a danger is open and obvious is an objective question that considers whether the "person using the product should know of the danger, or should in using the product discover the danger." *Whirlpool Corp. v. Hurlbut*, 303 S.E.2d 284, 288 (Ga. Ct. App. 1983) (citation omitted). Thus, when a "product is vended to a particular group or profession, the manufacturer is not required to warn against risks generally known to such group or profession." *Eyster v. Borg-Warner Corp.*, 206 S.E.2d 668, 670 (Ga. Ct.

App. 1974) (quotation omitted); *see also Farmer v. Brannan Auto Parts, Inc.*, 498 S.E.2d 583, 585 (Ga. Ct. App. 1998) (Georgia courts "ha[ve] held on numerous occasions that where a product is sold to a particular group or profession, there is no duty to warn of risks generally known to that group or profession.").

In applying this principle, Georgia courts found no duty to warn (via beeper or otherwise) of a truck's backwards movement because "the fact that the truck . . . would sometimes move in reverse was an obvious and well-known danger that did not require a warning." *Vickery v. Waste Mgmt. of Ga., Inc.*, 549 S.E.2d 482, 484 (Ga. Ct. App. 2001). Similarly, Georgia courts have found no duty to warn of the risks of electrocution from miswiring or mishandling wires to professionals because "[t]he danger . . . should be both open and obvious to an experienced installer." *Moore v. ECI Mgmt.*, 542 S.E.2d 115, 121 (Ga. Ct. App. 2000); *Eyster*, 206 S.E.2d at 670 (no duty to warn because "the specific danger of the aluminum-copper connection was one commonly known to those in the trade"). Indeed, even when the party at issue was a student and not a formally qualified professional, Georgia courts have found no "duty to warn a student with a degree in chemistry of the dangers of mixing . . . common chemicals." *Niles v. Bd. of Regents*, 473 S.E.2d 173, 176 (Ga. Ct. App. 1996).

And perhaps most directly on-point, in *Weatherby v. Honda Motor Co.*, a Georgia court held that the risk of ignition of spilled gasoline when interacting with an engine was open and obvious.

393 S.E.2d 64, 67 (Ga. Ct. App. 1990), *overruled on other grounds by Ogletree v. Navistar Int'l Transp. Corp.*, 500 S.E.2d 570 (Ga. 1998). In *Weatherby*, an adult friend gave a five-year-old child a ride on a "scaled-down" motorcycle with the gas can open. *Id*. at 65. After riding over a bump, gasoline splashed from the open tank onto the engine, igniting and causing severe burns. *Id*. Plaintiffs argued that while the open gas can presented some obvious danger, the dangers of spilled gasoline specifically contacting the engine were not generally known. *Id*. at 67. But the court rejected this argument and instead found as a matter of law that "[g]asoline is well known as an extremely flammable substance which may be easily ignited when subjected to heat or electrical impulses such as found about the surface of an operating gasoline engine." *Id*.

When reviewing the undisputed facts of this case with this precedent in mind, Daimler owed Leslie no duty to warn of the risk that diesel fuel tanks might ignite in a heavy truck crash occurring at freeway speeds. The danger that a fire might ignite from a forward frontal crash at freeway speeds is open and obvious for the reasons we explain below.

As an initial matter, Leslie was a nine-year veteran in the trucking industry at the time of the crash. There is no question that under an objective analysis, any reasonable individual should know that diesel fuel is highly flammable and even explosive under the right conditions. *See Whirlpool*, 303 S.E.2d at 288. And even if any reasonable person is not generally aware of the explosive potential of diesel fuel from a catastrophic crash, a reasonable

professional of Leslie's ilk definitely should have been. As the district court pointed out, for purposes of evaluating whether the danger was objectively open and obvious, Leslie's work experience and training placed him in a group of "sophisticated user[s] of heavy trucks expressly trained on the risks involved in operating them, as is required to obtain a CDL license," including the risks of fire generally and specifically from a serious accident.

Further, any experienced operator of the vehicle would constantly be reminded of the placement of the fuel tank and the dangers of a crash while refueling. On the 2005 Columbia, as with every other truck of comparable size in the nation, the fuel tanks are placed outside the rails on each side of the front and passenger doors, as seen in the picture provided in the record below:



Any operator of a 2005 Columbia, or any similar truck, would frequently be reminded of the placement and presence of the fuel

tanks any time they refueled the truck, and many would also notice the tanks when they stepped over the rails to enter the cab.

The obviousness of the danger would therefore be clear to any reasonable observer. As a matter of Georgia law, the risks of vehicle fuel are open and obvious. *See, e.g.*, *Weatherby*, 393 S.E.2d at 67. And just as an objectively reasonable operator in *Weatherby* would have been aware of the dangers of fuel spilling on an engine, any reasonable operator of heavy trucks would no doubt be aware that a crash occurring at "approximately 70 miles per hour" could compromise the frame of the truck, rupture a fuel tank, and generate a spark. In short, Daimler owed Leslie no duty to warn him that a crash occurring at freeway speeds might cause a fire because such a danger would be open and obvious to any reasonable operator of a heavy truck, much less an experienced veteran like himself.

Leslie's argument to the contrary is unavailing. In Leslie's view, the danger at issue is not that a fire may generally result from a crash, but the "heightened risk" of a fire occurring because of Daimler's design choices in placing fuel tanks, without effective protection, on the outside of the frame rails and behind the front axle. Leslie argues this risk is not open and obvious because he is not an expert in how Daimler designs its trucks and any latent defect would thus not be open or obvious to him or any other "experienced" truck driver, who might otherwise assume safety measures are in place which would effectively prevent fire from occurring during a crash.

This argument fails for three reasons.  First, while Leslie is correct that he cannot, and should not, be expected to know of all remedial measures Daimler took to make its fuel tanks safer, nothing in Georgia law suggests that a plaintiff may ignore an open and obvious danger simply by assuming the manufacturer will have allayed the danger for them in some way.  Instead, Georgia caselaw suggests the opposite: it is not reasonable to assume that some unseen extra safety measure eliminates the risk of an open and obvious danger.  *See Niles*, 473 S.E.2d at 176 (there was no "duty to warn a student with a degree in chemistry of the dangers of mixing these common chemicals").

Second, and similarly, while Leslie is correct that his profession does not make him an expert in heavy truck design, that contention is irrelevant.  As discussed above, his experience made him intimately aware of the existence and placement of the fuel tanks on heavy trucks.  Put simply, given his "daily" work required him to fuel the tanks and step over them into the cab, we cannot say that a lack of understanding of Daimler's design choices in any way negates the "obviousness" of the danger of a severe frontal impact to the integrity and safety of those containers.  *See Eyster*, 206 S.E.2d at 670 (no duty to warn because "the specific danger of the aluminum-copper connection was one commonly known to those in the trade").

Third, Leslie repeatedly refers to some "heightened" danger resulting from Daimler's design choices of which he was not warned.  Yet here, it is unclear what "heightened" danger Daimler's

design choices created as compared to other commercial freight tractors. If such evidence even exists, it is certainly not in this record.[6] As with the issues discussed above, Leslie's argument thus fails because it ignores the knowledge of a reasonable heavy truck driver in Leslie's position, which would inevitably be aware of the existence of and placement of Daimler's fuel tanks in an identical location to all other fuel tanks in similar trucks across the nation.

In summary, the risk of a fuel fire occurring after crashing a heavy vehicle operated at "approximately 70 miles per hour" is open and obvious. Daimler owed Leslie no duty to warn him that a crash at freeway speeds might cause a fire.

> B. *Leslie did not present sufficient evidence for a reasonable jury to conclude that Daimler designed the 2005 Columbia with a reckless disregard for the value of human life*

Leslie next argues that the district court erred in granting summary judgment to Daimler on his negligent design claims. He argues that he provided evidence that 1) Daimler knew fires were possible from the front axle breaching the fuel tank because there had been 72 prior similar incidents, 2) Daimler failed to perform a formal Failure Modes and Effects Analysis ("FMEA,")[7] 3) his expert

---

[6] Even Leslie's own expert admitted that any alternative design choices were merely theoretical and that Daimler placed and protected their tanks in exactly the same location and manner as all other heavy trucks in the United States.

[7] The FMEA process is "a systemized group of activities intended to: (a) recognize and evaluate the potential failure of a product/process and its

testified about several theoretical mechanisms whereby Daimler could have reduced the risk, such as adopting a Formula One tethering system, and 4) his expert testified that he believed Daimler's engineers could have adopted these novel theories for heavy trucks in 2005. According to Leslie, this evidence is sufficient for a reasonable jury to determine that Daimler designed the 2005 Columbia with reckless disregard for his life. We disagree.

As discussed above, Leslie's negligent design claim sounds in Georgia law. And under Georgia law, there is a general prohibition (called a statute of repose) on commencing any action "with respect to an injury after 10 years from the date of the first sale for use or consumption of the personal property causing or otherwise bringing about the injury." O.C.G.A. § 51-1-11(b)(2). In this case, the subject truck was first sold for use in 2005. The accident occurred more than 10 years later, in 2017. So both parties agree the statute of repose applies.

There is, however, an exception to the statute of repose, which Leslie argues applies here. Under O.C.G.A. § 51-1-11(c), a claim related to a design older than 10 years may be sustained if it arises "out of conduct which manifests a willful, reckless, or

---

effects, (b) identify actions which could eliminate or reduce the chance of the potential failure occurring, and (c) document the process." *Nease v. Ford Motor Co.*, 848 F.3d 219, 224 (4th Cir. 2017). The FMEA process is one of several common engineering methods to "proactively try to determine what are all of the possible failure modes for that particular new design." *Id.* at 226. In short, the district court aptly described the process as a "brainstorming" session to identify potential defects in the design of a product.

wanton disregard for life or property." Here, Leslie appears to agree that there is no evidence of any willful or wanton conduct by Daimler. Instead, Leslie focuses on the "reckless disregard" exception under the statute. *Id.*

The Georgia Supreme Court recently addressed what constitutes conduct manifesting a "reckless disregard" for life under O.C.G.A. § 51-1-11(c). They formulated the test as follows:

> [A]n actor's "conduct . . . manifests a . . . reckless . . . disregard for life or property," under OCGA § 51-1-11 (c), if the actor intentionally does an act or fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable person to realize that the actor's conduct not only creates an unreasonable risk of harm to another's life or property but also involves a high degree of probability that substantial harm will result to the other's life or property.

*Ford Motor Co. v. Cosper*, 893 S.E.2d 106, 118–19 (Ga. 2023).[8]

---

[8] *Cosper* also explicitly disapproved of *Chrysler Group., LLC v. Walden*, 792 S.E.2d 754 (Ga. Ct. App. 2016), on which Leslie relies heavily, for failing to incorporate the reasonable person standard and failing to see that "recklessness [also] involves the creation of an unreasonable and substantial risk of harm." *Cosper*, 893 S.E.2d at 119 n.7. Given that both the reasonableness of Daimler's actions and the nature of the risk of harm it subjected Leslie to are key issues in this case, we find any reference to *Walden* in this case at best unhelpful and at worst deliberately misleading.

In other words, as relevant here, Daimler can only be liable under O.C.G.A § 51-1-11(c) if it "fail[ed] to do an act . . . knowing or having reason to know of facts which would lead a reasonable person to realize that [its] conduct . . . involves a high degree of probability that substantial harm will result to the other's life." *Id.* We turn then to the evidence Leslie alleges establishes that Daimler "knowingly failed to act" in a manner that would cause a reasonable person to realize they were creating an "unreasonable risk of [substantial] harm" and a "high degree of probability" that harm would occur. *Id.*

To begin, Daimler indisputably knew that accidents involving heavy trucks carried with them a serious risk of fuel-related incidents that would result in injury. It was partly for this reason that Daimler participated in the 1989 Maryland Study, which Leslie's expert described as the most comprehensive study on the subject ever produced. Without question, Daimler knew that fuel tank breaches could be highly dangerous and should be prevented.

However, there is also no question that Daimler took substantial efforts to reduce the risk of fuel-induced fires in the 2005 Columbia. Its fuel tanks passed each of the safety tests required by federal regulations. And specifically in response to the Maryland Study, Daimler evaluated and incorporated several mechanisms intended to reduce the risk of post-crash fuel fires. These included (1) improved thermal fuel tank venting, (2) reduced tank diameters to increase ground clearance, (3) increased tank strength to exceed federal safety standards, (4) increased tank wall

thickness, (5) increased tank strength through the use of new alloys, (6) redesigned fuel tank mounting brackets, (7) relocated fuel transfer lines to the top of the tank, (8) a tank support system that reduced the risk of rupture in a collision, and (9) the moving of other truck components away from the fuel tanks to reduce the risk of tank puncture during a collision.

In light of these substantial efforts to improve safety, Leslie does not (and could not) argue that Daimler designed the tank without any regard for the safety of its drivers. Instead, Leslie argues that the key "failure to act" showing reckless disregard is that, despite its knowledge of the risks, Daimler failed to make the fuel tanks even safer. *See Woods v. A.R.E. Accessories, LLC,* 815 S.E.2d 205, 209 (Ga. Ct. App. 2018) ("[L]iability for defective design attaches only when the plaintiff proves that the seller failed to adopt a reasonable, safer design that would have reduced the foreseeable risk of harm.") (emphasis omitted) (quotation omitted)).

Specifically, Leslie points to the testimony of his engineering expert, Dr. Brian Herbst. Dr. Herbst claimed that in 2005, Daimler could have (1) added a heavy, steel beam-reinforced structure behind the factory bumper that, according to Leslie, "prevents underride and engages the energy absorbing structures of passenger cars," (2) used a Formula One tethering strategy with "high strength fibers" to "secure the front axle assembly to the frame in order to limit axle displacement and absorb energy during a crash," (3) moved the fuel tank behind the truck's cab or inside the frame rail, or (4) added fuel tank guards to protect side-

mounted fuel tanks. Dr. Herbst testified that he believed that Daimler could "feasibly" have adopted any of these alternatives. Importantly, however, Herbst also admitted that each of these designs was theoretical, as they had never been adopted in any United States truck and would require additional engineering he had not performed or explained before they could be incorporated.

Dr. Herbst's admission is fatal to Leslie's reckless disregard claim under Georgia law, and summary judgment is therefore appropriate as explained below.

These theoretical alternatives are insufficient for several reasons. As an initial matter, it is undisputed that while crashes resulting in fires occur, they are statistically rare events, with the only evidence in the record on this issue reflecting 72 fires in crashes in over 25 years and among 1.4 million Freightliner/Daimler trucks manufactured in that time period. Accordingly, Daimler's failure to adopt Leslie's proposed designs must be evaluated in light of whether Leslie can show that a reasonable person in Daimler's position would realize that its failure to adopt would make it *highly probable* that any of those fires—already rare events—would have been prevented if they had acted. *See Cosper*, 893 S.E.2d at 118–19. In other words, Leslie needed to introduce evidence that Daimler knew of facts which would cause a reasonable person to realize that the minuscule number of crash-related fires, with their various circumstances and causes, would each have a high probability of not occurring if Daimler had acted on those facts.

No evidence in the record proves that Daimler had any knowledge that would cause a reasonable person to come to such a realization. While Dr. Herbst testified that his proposed designs would have prevented Leslie's accident, neither Dr. Herbst nor any other evidence indicates that Daimler knew that failing to incorporate Dr. Herbst's proposed designs would result in a "high probability" of life-threatening injury. Indeed, no directly on-point data exists about the effectiveness of Dr. Herbst's proposed safety measures on heavy trucks in the United States with their unique specifications and freeway conditions, because none of these proposed alternatives has ever been adopted by Daimler or any other heavy trucking company, even in the 20 years since the 2005 Columbia was built. In short, nothing in the record suggests that Daimler had any knowledge regarding whether adopting Dr. Herbst's proposed alternatives would result in a "high probability" of preventing fires in crashes.

The closest Herbst comes to alleging Daimler had any awareness of facts that would cause a reasonable person to realize that failure to adopt any of these safety measures had a "high probability" of resulting harm is when he states that the Maryland Study "concluded that it was a highly effective fire mitigation strategy to relocate the fuel tank components." But this citation alone is insufficient for two reasons. First, a single study stating that relocation is "highly effective" still does not directly speak to whether it has a "high probability" of preventing an accident. Second, Daimler could not have known (and thus could not have reasonably realized) that *ignoring* that alternative would result in a

"high probability" of injury to life or property because *that very study* suggested that moving the fuel tanks could lead to other, more serious dangers. The Maryland Study itself determined that "[a] less vulnerable position is not apparent." Daimler did not recklessly disregard its duty to safety by accepting the conclusion of the most comprehensive study (that Leslie's own expert cited) to discuss the safety risks associated with the placement of fuel tanks.

Neither can the theoretical benefits proposed by Herbst, and of which he alleges Daimler was aware, be considered sufficient to show reckless disregard. To be sure, Herbst may testify that alternatives existed that would have made the 2005 Columbia safer. And (reliability and feasibility issues aside), it is at least a closer call whether such testimony would be sufficient to create a jury issue in a typical negligence case on the question of whether "the risk of harm outweighs the utility of a particular design." *Maynard v. Snapchat, Inc.*, 870 S.E.2d 739, 746 (2022).

But testimony regarding the theoretical possibility of an increase in safety cannot lead a reasonable jury to conclude that ignoring that possibility demonstrated Daimler "knew facts" that would cause a reasonable person to realize there was a high probability that harm would occur if they failed to act. *C.f. Watkins v. Ford Motor Co.*, 190 F.3d 1213, 1217 (11th Cir. 1999) (despite Ford's engineers' submission of "five proposals" to improve stability and internal knowledge of a 3.5 times rollover rate as compared to other SUVs, "[m]anagement selected the least expensive proposal,"

resulting in a vehicle that was even less stable). Such speculative theories can only show that Daimler was aware of the possibility that harm might be reduced, not knowledge that failing to adopt the theories *would* result in a high probability of injury to life. *See Cosper*, 893 S.E.2d at 118–19; *Weisgram v. Marley Co.*, 528 U.S. 440, 445–46 (2000) (judgment as a matter of law warranted where expert testimony, the sole evidence supporting product defect claim, was "speculative and not shown to be scientifically sound").

In summary, Leslie alleges that every heavy truck manufacturer in America, including Daimler, has designed its fuel tanks for at least the last 20 years with reckless disregard for the lives of their drivers. In support of this bold claim, Leslie presented testimony that Daimler knew crash-induced fires occur, knew of several theoretical ways by which they could have made their trucks safer, and nonetheless failed to adopt those theoretical safety mechanisms. But under Georgia law, such theoretical evidence falls short of what is necessary for a reasonable jury to conclude that Daimler had the requisite knowledge that its failure to act would result in a high probability of injury to life. At most, a jury could conclude that Daimler knew it was possible that injury could be prevented, which cannot by itself prove "reckless disregard" under Georgia law. *Cosper*, 893 S.E.2d at 118. Thus, we affirm the district court's grant of summary judgment to Daimler on Leslie's negligent design claims.

## IV.    Conclusion

The district court's judgment is affirmed on all counts.

26                    Opinion of the Court                    24-11372

**AFFIRMED.**